Filed 11/6/14  Fireman's Fund Ins. v. Black CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DOMINIQUE BLACK,<br><br>        Defendant and Appellant. | A136603<br><br>(San Mateo County<br>Super. Ct. No. CIV511997) |

Dominique Black submitted a claim to his insurer, Fireman's Fund Insurance Company.  The claim was initially denied and, over the next couple of years, Black communicated with company representatives through letters, emails, and telephone conversations.  In these communications, Black complained, often in vitriolic terms, that Fireman's Fund handled his claim improperly, engaged in illegal activities, and had ties to the Nazi regime in Germany.

Fireman's Fund sued Black alleging that his communications amounted to civil extortion, interference with contractual relations, interference with prospective economic advantage, and unfair business practices.  Black responded by filing a special motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP[1] motion).  The trial court denied the motion after finding that Black's communications amounted to extortion as a matter of law and were not constitutionally protected.

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation."

1

We affirm the denial of the anti-SLAPP motion. But unlike the trial court, we conclude that Black's communications did not amount to extortion as a matter of law, and at least some of them were constitutionally protected. We nonetheless affirm the denial of the anti-SLAPP motion because Fireman's Fund's claims have at least minimal legal merit under the facts established thus far in the proceedings. We otherwise take no position on the strength of these claims.

FACTUAL AND PROCEDURAL
BACKGROUND

This case arose as a result of a claim Black submitted to Fireman's Fund for losses incurred on a "vintage" motor home he purchased in 1999 for $26,000. The losses were allegedly extensive. Black alleged that he delivered the motor home to a company, Northern California Classic GMC Service (NorCal), to be restored and modified. He alleged that NorCal failed to complete the work and abandoned the vehicle after being paid more than $250,000. Black eventually regained possession of the motor home and filed a suit against NorCal and its owners and associates for fraud, breach of contract, and common counts. After settling with NorCal's owners for $116,000, Black obtained a default judgment against the remaining defendants for more than $323,000.

In the insurance claim submitted to Fireman's Fund, Black asked for over $215,000 for the vehicle's replacement costs, including amounts paid for work not performed and parts not installed, as well as for court costs in his suit against NorCal. An appraiser with Fireman's Fund inspected the motor home and found no evidence of vandalism or theft of parts and concluded the vehicle's poor condition was the result of a "renovation gone bad." Fireman's Fund contended that the motor home was worth only about $6,000 when Black regained possession of it and that Black's policy did not cover

2

losses from uncompleted work, uninstalled parts, or court costs. Accordingly, in May 2010, Fireman's Fund initially denied Black's claim.[2]

This denial, however, far from resolved the matter. Over the next two years, Black continued to demand full payment of his claim, and Fireman's Fund repeatedly reconsidered it. During this time, the parties engaged in a contentious exchange of writings, mostly emails, and the content of these communications forms the basis of Fireman's Fund's suit against Black. Most of the emails were between Black and Don Lesser, an attorney retained by Fireman's Fund to serve as the point of contact for Black, with copies sent to others.

In the communications, Black asserted extensive grievances against Fireman's Fund. Among other things, he accused the company of improperly checking his business credit history and other records, requiring him to fill out a vehicle-theft affidavit, and exchanging his policy for another one with a lower policy limit.[3] He also claimed Fireman's Fund was engaged in illegal money laundering by cancelling customer policies and substituting them with less desirable, more expensive policies.

Black was also troubled by the business and financial affairs of Fireman's Fund's parent company, Allianz SE (Allianz),[4] which he believed had been aligned with the Nazi regime in Germany. He investigated purported misdeeds by Allianz during the Holocaust, and he implied to Lesser that Allianz never paid off on insurance policies that the company had issued to Jewish policyholders who were killed in concentration

---

[2] Early in the claims process, Fireman's Fund asked for proof the vehicle had been vandalized, but Black provided only a copy of the default judgment. Fireman's Fund told Black the default judgment did not indicate whether, how, or in what amount the vehicle was actually damaged. Black countered that the default judgment was all the proof he needed.

[3] Fireman's Fund filed a declaration indicating there was no difference in coverage between the two policies.

[4] Allianz, the parent of Fireman's Fund, is based in Germany, and is a global insurer.

3

camps.[5]  Black claimed that, like Allianz, Fireman's Fund engaged in wide-ranging financial and other improprieties.

Even before his claim was denied, Black sent a letter to the company's director of automobile claims, copying other personnel, threatening to file a complaint with the California Department of Insurance (CDI), to use "social media to facilitate a viral consumer brand awareness campaign about Allianz's history of 'evil and corruption' in a global boycott of Allianz products and stock until [Fireman's Fund] *corrects its conduct*," and to pursue civil litigation "after this campaign."  (Italics added.)  In the later onslaught of emails, Black frequently referred to the Allianz-Nazi connection.  In a declaration Lesser submitted in connection with the anti-SLAPP motion, Lesser stated that in telephone conversations Black repeated his threats to launch a "social media campaign" against Fireman's Fund and to associate it with Nazis.  According to Lesser, Black avowed this would injure Fireman's Fund reputation, reduce the company's stock prices, and create problems for the company's senior executives.  Lesser also declared that Black told him that he (Black) would not launch his campaign if Fireman's Fund paid the $215,000 he was demanding.

Black's methods and persistence succeeded in getting Fireman's Fund repeatedly to reconsider his claim.  In the latter part of 2010, Fireman's Fund assigned the claim to a new adjuster, but this adjuster concluded that Black's claim could not be paid under the terms of the policy.  In April 2011, Fireman's Fund assigned the claim to yet another claims adjuster. That same month, Black wrote to Lesser, "This matter is epic, five years, seven volumes documenting greed, negligence, fraudulent concealment and finally, malicious, oppressive acts of banal evil by" three named Fireman's Fund employees.  He

---

[5] For example, on October 3, 2011, Black sent an email to Lesser that included the following paragraph:  "When your client's insureds[] illegally left the jurisdiction of the policy issuing country, Germany, in violation of either contract or prevailing law; These 'insured scofflaws' were stripped of their policy rights.—They had improperly relocated to a Polish village named Auschwitz to be first-time users of Zyklon B, a state of the art product— produced by another Allianz customer for a local processing facility,— managed in part by an Allianz insured workforce."

warned that those employees could be liable under the state's unfair competition law. A couple of months later, Black sent an email to the new claims adjuster and vowed to "escalate this issue to additional controlling authorities once it has been <u>clearly</u> rejected by you as submitted by me." (Underlining in original.)

In August 2011, Black sent an email to Lesser riddled with Nazi-related accusations against Allianz, Fireman's Fund, and their employees, including that Allianz and Fireman's Fund had a policy of "CLAIMS EXTERMINATION." A few days after this email, Black sent Lesser a banner he had designed to accompany his proposed social media campaign which had the words: "ALLIANZ-FFIC EXTERMINATES CLAIMS" superimposed over other images, including a swastika.

In late September 2011, Black sent another email to Lesser, 18 Fireman's Fund employees, and the CEO of Allianz identifying Fireman's Fund's general counsel and calling for her to be "replace[d]." He asserted that the general counsel and another attorney in her office were " 'despicable' " and " 'no better than the Nazi collaborators who control them.' " He also stated that they " 'favored drug dealers over their insured,' " " 'ratified corporate criminal conduct in order to conceal [Fireman's Fund's] breaches of contract and fraud,' " and were "willing to throw their insured into a modern gulag in order to cover up their violations and improve their quality assurance metrics." Black demanded the " 'discipline' " or the firing of other Fireman's Fund employees.

The following day, Black wrote yet another email, this time to the company's chief executive officer (CEO) and others, calling for the removal of the company's general counsel from the board of directors and also repeating his threat to create a "social network of 500,000," to mount a "raw and hard hitting campaign" with the goal of "bring[ing] notice of and reform to the immoral conduct of renegade Allianz executives." In response to some of these charges, Lesser warned Black that his statements "constitute[d] libel, slander and/or trade libel."

A few days after his email to the CEO, Black again wrote to Lesser, this time raising concerns about methamphetamine contamination in the motor home.[6] He also charged that Allianz and Fireman's Fund were "under the control of former NAZI collaborators," and that Fireman's Fund employees acted like "NAZI's from the insurance industry" and had used "totalitarian tactics reminiscent of past Allianz executives," while engaging Black in a "war of extermination." He accused one of the lawyers from Fireman's Fund of "threaten[ing] to launch [a] legal extermination campaign to muzzle [his] grievance." He threatened to "publically [*sic*] unmask[]" members of a "renegade . . . unit" of Fireman's Fund, who he claimed had "targeted" his family.

At the end of September 2011, Fireman's Fund sent Black a check for $8,994.95 for reimbursement of lost or stolen parts from the motor home and some of Black's towing and storage costs. Black refused to accept it. Around this time, he sent a photocopy of a Web page design he intended to launch titled, "AllianzWatch . . . a voice for the consumer and investor," which included the banner with a swastika, and with the following lead in: "De-Nazified 65 years ago. . . . Has the beast returned in Fireman's Fund[?]"

In late 2011, Fireman's Fund again reconsidered Black's claim. But in mid-January 2012, Fireman's Fund informed Black in a 12-page letter that it had not found any evidence the motor home suffered additional physical loss or damage covered by his policy. Black responded with an offer to settle the claim for $147,000, saying he would hold the offer open until January 27. On January 27, Black told Lesser he was "escalating [his] concerns" to the president and CEO.

Around this time, Fireman's Fund apparently decided that it had had enough. In February 2012 it brought two cases against Black. First, it filed a petition to prevent

---

[6] Because Black claimed that methamphetamines or other toxins had contaminated the vehicle, Fireman's Fund retained a credentialed forensic industrial hygiene firm to test surfaces within the vehicle. It appears, however, that Black would not give the firm access to his motor home to conduct the inspection.

6

workplace violence under Code of Civil Procedure section 527.8[7] in which it sought to protect its employees from potential violence from Black.[8]  Second, it filed the instant suit alleging causes of action for civil extortion, interference with contractual relations, interference with prospective economic advantage, defamation, and unfair business practices, and it requested compensatory and punitive damages and injunctive relief.  In this suit, Fireman's Fund filed an application for a temporary restraining order, which was denied after the court found that the company had "failed to demonstrate a likelihood of success on the merits . . . [and that] prior restraints on free speech are highly disfavored."  Two months later, Fireman's Fund amended its complaint reiterating the same causes of action, except it eliminated the defamation claim and all requested relief except an injunction.  The requested injunction sought to prohibit Black from "[p]ublishing statements or images in any media and on any Web site stating that Fireman's Fund personnel have committed crimes or fraud, or that associate Fireman's Fund or its business practices with Nazis, with the conduct, practices or statements of the Nazi regime, or with the *Einsatzgruppen*";[9] from "using the word[s] 'Allianz' [or] 'Fireman's Fund' in conjunction with the word 'Nazi,' the word 'exterminate,' and/or an image or images of a swastika . . ."; and from "[c]ommunicating with or contacting . . . Fireman's Fund . . . employees with any communications that are alarming, annoying, harassing, intimidating, threatening, vile, ugly[,] or hateful."

In response to the amended complaint, Black filed the anti-SLAPP motion that is the subject of this appeal and requested the court to take judicial notice of an 82-page

---

[7] Undesignated statutory references are to the Code of Civil Procedure. References to subdivisions standing alone are to the subdivisions of section 425.16.

[8] *Fireman's Fund v. Black* (Super Ct. San Mateo County, 2012, No. 511775).  A temporary restraining order was issued that day to protect four employees, but Black was not notified of it.  This order was in effect for six months.  After a hearing in August 2012, the trial court denied the request for a permanent injunction under section 527.8 and dissolved the temporary order.  Black's unopposed request for judicial notice filed April 19, 2013, is hereby granted.  (Evid. Code, §§ 452, subd. (d), 459.)

[9] This word apparently refers to Third Reich paramilitary units.

declaration he had prepared for the workplace-violence case. Fireman's Fund opposed both the motion and the request for judicial notice. On July 10, 2012, Black filed his 82-page declaration, including voluminous exhibits, which was mostly devoted to denying he posed a threat to the company's employees. Fireman's Fund promptly moved to strike it. Black then filed a reply with a five-page supplemental declaration, with more exhibits. This declaration appears to be mostly intended to show the Allianz-Nazi connection is a matter of public interest. Fireman's Fund moved to strike, and filed objections to, the supplemental declaration. It also filed declarations in support of its opposition to the anti-SLAPP motion, and Black filed written objections to those declarations.[10]

Meanwhile, two days after filing his 82-page declaration, Black filed a regulatory complaint against Fireman's Fund with CDI, alleging that Fireman's Fund (1) failed to provide advance notice of a nonrenewal of his policy, (2) replaced his policy with a less favorable one, (3) conducted "illegal and improper corporate credit checks" on his business, (4) delayed processing of his claim, (5) retaliated against him by demanding excessive documents and testimony from him, and (6) engaged in intimidation tactics by threatening to file suit.

After a hearing, the trial court denied the anti-SLAPP motion on the basis that Black failed to establish he had engaged in protected activity under section 425.16, subdivisions (e)(2) or (e)(4). A written order followed. The court found that Black's

---

[10] Although the trial court did not enter an explicit ruling on the motions to strike or the parties' objections, it admitted Black's declarations at a hearing on July 19. On appeal, Fireman's Fund urges us to rule on its outstanding objections. We decline to do so. In the context of an anti-SLAPP motion, evidentiary objections are forfeited in the absence of an explicit ruling on them. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291, fn. 17 (*Soukup*) [evidentiary objections forfeited in the absence of an explicit ruling when appellate court reviews an order under § 425.18]; but cf. *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 531-532 [evidentiary objections not forfeited in the absence of an explicit ruling when appellate court reviews a summary judgment].) Furthermore, even if we were to rule that the evidentiary rulings had not been forfeited below, we would deem them forfeited on appeal because they have not been presented and argued with specificity. (See *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

threatening emails were extortionate as a matter of law, that the private emails could not constitute an exercise of the right of petition, that Black had not argued that the emails constituted an exercise of free speech, and that Black had failed to demonstrate that the emails were made in connection with a public issue or an issue of public interest.

DISCUSSION

A.    The Anti-SLAPP Statute and the Standard of Review.

The Legislature enacted section 425.16 because of "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) The law declares that "it is in the public interest to encourage continued participation in matters of public significance, and . . . this participation should not be chilled through abuse of the judicial process." (*Ibid*.) The heart of the anti-SLAPP statute is contained in subdivision (b)(1): "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Subdivision (e) specifies four categories of protected acts: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Courts engage in a two-step, burden-shifting process in evaluating an anti-SLAPP motion. Under the first step, the court considers whether the defendant has made a prima facie showing that the plaintiff's cause of action arises from actions taken in furtherance

9

of the right of petition or the right of free speech in connection with a public issue. (§ 425.16, subd. (b)(1); *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) To make such a showing, the defendant need not show that its actions were protected as a matter of law, but need only establish a prima facie case that its actions fell into one of the categories listed in subdivision (e). (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 314 (*Flatley*).) If the defendant cannot make this showing, the anti-SLAPP motion is denied, and the case continues to be litigated. A defendant cannot make this showing when its conduct is established by uncontroverted or uncontested evidence to have amounted to extortion and was thus "illegal as a matter of law." (*Id.* at p. 305.)[11]

In assessing the first step, the court examines the pleadings and declarations submitted in support of and in opposition to the motion. (§ 425.16, subd. (b)(2); *Flatley*, *supra*, 39 Cal.4th at p. 326; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).) It should not, however, draw inferences from the pleadings in a way that effectively relieve a party of its burden of proof. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1001-1002.) " '[I]f there is a genuine issue of material fact that turns on the credibility of [a] witness or on proper inferences to be drawn from indisputable facts, then the matter is not indisputable.' " (*Soukup, supra*, 39 Cal.4th at p. 286, quoting legislative history of § 425.18.)

If the defendant establishes a prima facie case that its actions fell into one of the categories listed in subdivision (e), the assessment turns to the second step where the burden is on the plaintiff. Under this step, the anti-SLAPP motion will be granted unless the plaintiff establishes "a probability" it will prevail, even though the claims arose out of protected activity. (§ 425.16, subd. (b)(1).) This means the " ' "plaintiff must

---

[11] In cases where the defendants' conduct is alleged to have been illegal but there is not uncontroverted or uncontested evidence establishing it to have been illegal *as a matter of law* under the first step of the anti-SLAPP analysis, the plaintiff has the burden of showing prima facie evidence of illegality under the second step in order for the case to proceed.

demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment." ' " (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476, italics omitted.)  To demonstrate that the complaint is legally sufficient, the plaintiff is only required to show a " 'minimum level of legal sufficiency and triability.' " (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989; *Navellier, supra*, 29 Cal.4th at p. 89.)  If the plaintiff does so, the anti-SLAPP motion is denied and the plaintiff may continue to litigate the case.  (See *Flatley, supra*, 39 Cal.4th at p. 332 & fn. 16.)  Thus, an anti-SLAPP motion is only granted when the defendant shows that its conduct was constitutionally protected, and the plaintiff fails to satisfy its burden under the second step.

We review an appeal of an order denying an anti-SLAPP motion de novo. (*Oasis W. Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  And we affirm regardless of the grounds on which the lower court relied if the trial court's denial is correct on any theory.  (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1307.)

B.      Black Satisfied His Burden of Showing Some of His Communications
         Constituted Protected Speech Under the First Step of the Anti-SLAPP
         Analysis.

Black claims his communications were protected within the meaning of section 425.16, subdivisions (e)(2) and (e)(4) because they were made "in anticipation of litigation and other official proceedings" and "in furtherance of [his] rights of petition and free speech about issues of public interest."  We agree that some of Black's communications fell within these categories.

11

*1. Some of Black's Communications Were Made in Anticipation of Official Proceedings and Litigation.*

As mentioned above, subdivision (e)(2) of the anti-SLAPP statute protects "any written or oral statement or writing made *in connection with* an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (Italics added.) The phrase " 'under consideration or review' " does not limit the protection to a currently pending proceeding. (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 784.) " '[J]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], . . . such statements are equally entitled to the benefits of section 425.16.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115; see also *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887-888 [letter threatening to sue film distributors for distributing unauthorized film]; *Blanchard v. DIRECTV* (2004) 123 Cal.App.4th 903, 918 [demand letter threatening suit].)

Here, the trial court ruled that emails to private parties are not protected under subdivision (e)(2). We disagree, and we follow case authority holding that petitioning activity may be protected even if it is not made directly to a government agency. (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17-18 [defendant instigated petitioning activity by others]; *Blanchard v. DIRECTV, supra*, 123 Cal.App.4th at p. 918 [allegedly extortionate demand letters sent to potential pirates of defendant's television signals were protected].)

Black's communications fell within subdivision (e)(2) because Black threatened to file a complaint with CDI and bring a lawsuit. Fireman's Fund argues that its claims did not arise from threats of regulatory action but instead from other, unprotected conduct, namely Black's threat to "go public" with his Internet campaign and the creation of his Web site. But this position is inconsistent with the position Fireman's Fund took in both

12

the trial court and another part of its respondent's brief, where it listed Black's "[t]hreatening to report alleged violations of laws to various state and federal agencies" as one of his extortionate threats.

In fact, Black did file a complaint with CDI in July 2012. Fireman's Fund points out that it was not filed until after Fireman's Fund responded to the anti-SLAPP motion. Calling it a "sham" intended solely and belatedly to bring Black within the protection of subdivision (e)(2), Fireman's Fund suggests we ignore the CDI complaint in assessing whether Black's speech or petitioning activity was protected. We decline to do so. A trier of fact could find that the CDI complaint was evidence that Black's threats were made in earnest as a concerned consumer and would not have been abandoned in exchange for a pay off. (See *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1021-1022 [trial court could rely on postcomplaint evidence in ruling on anti-SLAPP motion].)

And Fireman's Fund's contention that its claims did not arise out of threatened litigation also rings hollow. According to Lesser, Black stated he (Black) would not file a lawsuit because he had no faith that the courts would look favorably on his position. But the fact is that Black's threats to file suit appear repeatedly in his emails, and the subject matter of his proposed litigation appears to have been broader than just the insurance-coverage issue. According to Black, he "put [Fireman's Fund] on notice since 2010 [he] intend[ed] on filing a lawsuit for fraud, RICO violation and Unfair Trade Practices. . . ."

The test in determining whether a litigation threat is protected is whether "the statement ' "concern[s] the subject of the dispute" and is made "in anticipation of litigation 'contemplated in good faith and under serious consideration.' " ' " (*Digerati Holdings, LLC v. Young Money Entertainment, LLC*, *supra*, 194 Cal.App.4th at p. 887; *Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 36-37 [attorney's voicemail message to client's sister accusing her of conspiracy to defraud and threatening "to take 'appropriate action' " held protected activity, with litigation " 'contemplated in good faith and under serious consideration' "].) " 'Whether a prelitigation communication relates to litigation

13

that is contemplated in good faith and under serious consideration is an issue of fact.' " (*Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1301.) On the record before us, we cannot say as a matter of law that Black was not serious in threatening litigation, and we thus conclude he satisfied his burden under the first step of the anti-SLAPP test to show that Fireman's Fund's claims arose from conduct protected under subdivision (e)(2).

2. *Some of Black's Communications Involved Matters of Public Interest.*

Subdivision (e)(4) includes "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." The trial court declined to address whether Black's conduct fell within this subdivision finding that "Black offers no argument that [his emails] constitute an exercise of free speech." We cannot agree. The anti-SLAPP motion and supporting memorandum show that Black brought the motion partly based on his "free speech rights . . . in connection with a public interest." Black specifically argued that "CCP § 425.16(e)(4) includes the conduct of private persons and entities when the subject is a matter of widespread public interest. [Citations.]"

The record includes ample evidence that Black's conduct was made in furtherance of his rights of petition and of free speech. Black's threat to create an "internet campaign" was at the heart of Fireman's Fund's first amended complaint, as confirmed by the number of times Fireman's Fund repeated the threat throughout its factual allegations. Fireman's Fund alleged that Black threatened to "create a 'viral' social media campaign," to "launch an internet social media campaign," to "escalate his dispute into the public realm," to "publicize his allegations of criminal conduct via the Internet," to " 'engage thousands of other consumers in crowd sourcing evidence [and] will virally communicate to worldwide communities warnings about companies like Allianz/[Fireman's Fund],' " and to " 'assert [his] rights through . . . a social network multimedia publication, broadcast and blog." Fireman's Fund complained of Black's " 'pending launch of a Social Network grievance campaign,' " his plan to reach a "social network of 500,000," and his having "set out text he intended to publish." The first

14

amended complaint concludes with the stated belief that "[Black] will launch the threatened 'campaign.' "

The first amended complaint also alleged that Black had "created a web site with which to spread these rumors" and through which he threatened to "engage thousands of other consumers . . .," thereby advancing what Fireman's Fund called "a false understanding that Fireman's Fund, a wholly-owned subsidiary of Allianz, [was] acting to 'exterminate' Black and his insurance claim with tactics used by Nazi paramilitary groups during World War II."

In assessing whether Black's conduct was on an "issue of public interest," we look to " 'the principal thrust or gravamen of the plaintiff's cause of action.' [Citation.] We 'do not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action.' [Citation.] The 'critical consideration' is what [conduct] the cause of action is 'based on.' [Citation.]" (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464-465, italics omitted.) An " ' " 'issue of public interest' " ' " is " ' 'any issue in which the public is interested." ' " (*Id.* at p. 465, italics omitted.) And whether an issue is of public interest is to be determined broadly, consistent with the statute's remedial purpose. (*Id.* at pp. 464-465.)

Black contends, and we agree, that speech complaining about an insurance company's allegedly illegal business practices in issuing, canceling, and substituting policies or processing claims must be considered speech on matters of public interest under subdivision (e)(4). Black's complaints were not limited to his own isolated insurance claim but also included accusations that Fireman's Fund suffered from internal corruption and was engaged in financial misconduct and "money laundering."

Many cases hold "consumer protection information" is a matter of public interest. (See *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 899-900 [warning on Web site about business practices of viatical settlement broker was protected as "consumer protection information" which could "aid consumers [in] choosing among brokers"]; *Hupp v. Freedom Communications, Inc.* (2013) 221 Cal.App.4th 398, 404 [" 'consumer information that goes beyond a particular interaction between the parties and implicates

15

matters of public concern that can affect many people is generally deemed to involve an issue of public interest' "]; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146 [warning on "Ripoff Report Web site" about "character and business practices" of forensics practitioner was protected because it was "intended to serve as a warning to consumers about his trustworthiness"]; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366-1367 [Web site yelp.com post about individual's experience with dentist was issue of public interest]; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23-24 [information posted on Web site about plastic surgeon contributed to public debate about plastic surgery]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344 [newspaper article critical of medical practitioner was " 'consumer protection information' "]; cf. *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 425 [skipping over first step because " 'everyone agree[d]' " a negative post on the Web site yelp.com about an apartment building manager was statutorily protected].)  We think it self-evident that potential consumers of insurance may be interested in the experiences of an insurance company's current customers.

Black's threat to publicize Allianz's past relationship with the Nazi regime in Germany is also a matter of public interest.  Information that an insurance company cooperated with Hitler's regime—and failed to pay life insurance benefits to the beneficiaries of policyholders who were exterminated in concentration camps—might well affect consumers' decisions about that company.  The fact Fireman's Fund itself was not a participant in these events, but is merely owned by Allianz, does not change our conclusion.

We therefore conclude that Black satisfied his burden under the first step of the anti-SLAPP test to show that Fireman's Fund's claims arose from protected activity.

C.      Fireman's Fund Failed to Establish by Concession or Uncontroverted and
        Conclusive Evidence that Black's Communications Constituted Extortion
        as a Matter of Law.

The trial court found that Black's communications amounted to extortion as a matter of law.  We disagree.  Although we recognize that many of the communications

16

were rude, uncivil, hostile, inflammatory, or threatening, we conclude that whether they amount to extortion depends on facts that have not yet been conclusively resolved.

*Flatley*, *supra*, 39 Cal.4th 299 is the leading case. There, a well-known dancer, Flatley, sued an attorney for civil extortion, intentional infliction of emotional distress, and wrongful interference with economic advantage. (*Id.* at p. 305.) The case arose after an attorney, D. Dean Mauro, sent a demand letter on behalf of a female client who claimed Flatley had raped her. Mauro demanded a seven-figure payment to "settle" his client's claims. (*Ibid.*) His demands suggested Flatley would be exposed to prosecution for unspecified violations involving immigration, tax, and Social Security law. (*Id.* at p. 329.) He warned if Flatley did not pay " 'seven figures' " to settle the claim, Mauro would disseminate press releases to a long list of media outlets and " ' "go public" ' " with the rape accusations to " ' "hit [Flatley] at every single place he tours" ' " and " ' "ruin him" ' " by ensuring the story would follow him wherever he performed. (*Id.* at p. 330.)

*Flatley* held that a defendant's anti-SLAPP motion fails when "either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law." (*Flatley*, *supra*, 39 Cal.4th at p. 320.) In concluding that Mauro's communications constituted extortion as a matter of law, the Supreme Court held (1) the threat made by an extortionist does not have to succeed in producing an exchange of money; (2) even if the threatened action is not itself illegal, the coupling of the threat with a demand for money may make it so; and (3) it is immaterial whether the purpose of the threat is to collect money justly due. (*Id.* at pp. 326-327.)

*Flatley* clarified that whether a defendant's communications amount to extortion may be made as a matter of law on the first step of the anti-SLAPP analysis. (*Flatley*, *supra*, 39 Cal.4th at p. 320.) But it also clarified that if "a factual dispute exists about the legitimacy of the defendant's conduct, [the issue] cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley*, *supra*, at p. 316.) Thus, for extortion to

17

be decided as a matter of law on the first step, it must be established by "defendant's concession or by uncontroverted and conclusive evidence." (*Id.* at p. 320.) Other courts have similarly concluded that making threats to someone to pay up or face legal consequences can amount to extortion, and it thus falls outside the protection of section 425.16. (See, e.g., *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1423; *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799, 807; *Cohen v. Brown* (2009) 173 Cal.App.4th 302, 317-318.)

In considering a claim of extortion under the first step of the anti-SLAPP analysis, the plaintiff bears the burden of showing uncontroverted or uncontested evidence of the illegality. "[O]nce the defendant has made the required threshold showing that the challenged action arises from assertedly protected activity, the plaintiff may counter by demonstrating that the underlying action was illegal as a matter of law because either the defendant concedes the illegality of the assertedly protected activity or the illegality is conclusively established by the evidence presented in connection with the motion to strike." (*Soukup, supra*, 39 Cal.4th at pp. 286-287 [decided under § 425.18, subd. (h)]; see also *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 964-965 [*Flatley, supra,* 39 Cal.4th 299 bars anti-SLAPP motions only where there is no factual dispute that the party bringing the motion has engaged in illegal conduct and "[t]he burden is on the party opposing a section 425.16 motion to strike to show that no factual dispute exists"].)

As we read *Flatley, supra*, 39 Cal.4th 299, the defendant's liability for extortion should be determined "as a matter of law" only where the evidence is so one-sided as to be indisputable. *Soukup, supra*, 39 Cal.4th at pages 285-286 discussed this language in the context of a SLAPPback action and concluded that illegality "as a matter of law" equates with " '*indisputably* illegal behavior.' " (Italics added.) This is but a specialized application of a more general principle: "Only when the inferences are indisputable may the court decide the [fact] issues as a matter of law. . . . An issue of fact becomes one of law only when 'the undisputed facts leave no room for a reasonable difference of opinion.' [Citation.]" (*Manuel v. Pacific Gas & Electric Co.* (2009) 173 Cal.App.4th 927, 937.)

*Flatley* itself pointed out the narrowness of its holding: "We emphasize that our conclusion that Mauro's communications constituted criminal extortion as a matter of law are based on the specific and extreme circumstances of this case. Extortion is the threat to accuse the victim of a crime or 'expose, or impute to him . . . any deformity, disgrace or crime' (Pen. Code, § 519) accompanied by a demand for payment to prevent the accusation, exposure, or imputation from being made. Thus, our opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion. (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* [(1990)] 218 Cal.App.3d [1058,] 1079 ['a person, generally speaking, has a perfect right to prosecute a lawsuit in good faith, or to provide information to newspapers'].) . . . In short, our discussion of what [constitutes] extortion as a matter of law is limited to the specific facts of this case." (*Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16.)

Here, the claimed illegality of Black's communications was the conditional nature of his threats: Fireman's Fund claimed Black threatened to "expose" its alleged wrongdoing only *if* he was not paid $215,000. Indeed, " '[b]y definition, extortion punishes *conditional threats. . . .*' " (*People v. Bolin* (2005) 18 Cal.4th 297, 339, italics added.) Thus, Fireman's Fund's theory that Black committed extortion as a matter of law requires Fireman's Fund to show not only that Black made threats, but also that Black impliedly agreed *not* to carry them out if he received enough money. (See *Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16 ["Extortion is the threat to accuse the victim of a crime . . . accompanied by a demand for payment *to prevent the accusation, exposure, or imputation from being made*"] italics added.)

The communications that Fireman's Fund points to as demonstrating such a link are ambiguous. For instance, as we mentioned earlier, Black threatened to use "social media to facilitate a viral consumer brand awareness campaign . . . until [Fireman's Fund] *corrects its conduct*." (Italics added.) Whether by the italicized phrase Black

19

meant "pays my $215,000 claim" or "stops cheating its customers" is unclear. Fireman's Fund insists it can only be interpreted to mean the former, but we disagree.

Other evidence is also subject to different interpretations. In an email from Lesser to Black dated August 3, 2010, titled "Our telephone conversation," Lesser summarized, "If [Fireman's Fund] and you *agree on an amount that settles your claim*, you will drop all your other complaints about the company's handling of matters related to your policies and/or your claim including any alleged improper cancellation, non-renewal or renewal on different terms, any act or omission in the handling or investigation of your claim, and any investigation of a potentially fraudulent claim." (Italics added.) Black responded to this email three days later, stating in part, "*As you requested*, I suspended my grievance processing while you discussed this matter with Allianz/[Fireman's Fund]. In turn I requested a reasonably prompt reply." (Italics added.) Thus, Black's delay in actually "going public" may have originated with a request from Lesser. Black said he would "suspend" pursuing his grievance, not that he would drop it altogether.

Black also said in various formulations that if he and Fireman's Fund could not "resolve this matter," he would go forward with his threatened actions.[12] In another email Black complained to Lesser about the delays in processing his claim and suggested Fireman's Fund "act to settle this matter sooner than later before increased risks, liabilities and expenses exceed the economic value of this matter." Similarly, in Black's supplemental declaration he stated, "Throughout the course of my communications with

---

[12] Black said, "If we *cannot resolve this matter* then I reserve my right to . . . contact the regulatory relations counterparts at Allianz of American Corporation . . . in order to escalate my complaint about a serious incident. [¶] . . . I expect Allianz to resolve this matter. However, if necessary, I will also exerciseing [*sic*] my rights to appeal the claims denial process internally to the parent company; as a Shareholder to change corrupt management; request the insurance commissioner investigate the CIC policy renew and claims process system trouble reports systems; exercise my constitutionally protected rights as a citizen to speak in the digital public square. Voice my complaint about a corporate brand with a murderous and corrupt history that seems to have returned to is [*sic*] evil ways after a 65[-]year hiatus. And finally stand in the shoes of the Attorney General pursuant [to] [Business and Professions Code section] 17200 and in a year or so civilly litigate the matter." (Italics added.)

[Fireman's Fund], I made clear . . . that *if my claims was* [*sic*] *not settled to my satisfaction*, I would be making complaints to regulatory authorities and possibly filing a lawsuit." (Italics added) In yet another email, Black warned if two named Fireman's Fund in-house counsel "*do not resolve this matter satisfactorily*, higher ranking Allianz leaders will be noticed, and ultimately [the attorneys] will be judged for the consequences of this situation." (Italics added.)

According to Fireman's Fund, the phrases "act to settle" and those demanding a "satisfactory" resolution meant only one thing: payment of $215,000. But we cannot rule out the possibility a trier of fact could conclude that Black was looking for a different type of "settlement" involving issues other than money, for instance, the reform of some of Fireman's Fund's claim processing procedures or the removal of certain employees. Whether the demand the dispute be settled "to [Black's] satisfaction" amounted to extortion is a factual question.

Lesser's declaration explicitly draws the link between the threat and the money, saying "Mr. Black has repeatedly told me in telephone conversations and through numerous emails that his harassing tactics are intended to force Fireman's Fund to pay him the $215,000 he demands, and that it will all stop if he gets what he wants." Black's declaration did not admit or deny Lesser's specific assertion, and the emails themselves do not constitute conclusive evidence of extortion. Under these circumstances, we conclude there are triable issues whether Black engaged in extortion.

Our case is more fact-laden than was *Flatley*. In *Flatley* there was a letter and a series of telephone conversations in which the attorney expressed unwillingness to yield, issued a "*first, and only*" (italics in original, boldface and underlining omitted) or "first & final" demand for a " 'seven figure[]' " (boldface omitted) settlement, showed no interest in legitimate negotiation, and established a short and strict deadline on Flatley's response. (*Flatley, supra*, 39 Cal.4th at pp. 308-309, 311, 332.) There was every reason to conclude this was a "shake-down" of Flatley based on false accusations. Mauro threatened to report Flatley for unspecified, unrelated violations to the Internal Revenue Service, Social Security Administration, and immigration authorities. (*Id.* at p. 309.)

21

And even with his anti-SLAPP motion, Mauro had submitted no proof whatsoever that a rape had actually occurred. (*Id*. at p. 331, fn. 15.)

Black's email campaign, on the other hand, extended over a period of nearly two years and involved "hundreds" of communications. Despite the lengthy correspondence, and although he threatened various forms of "exposure," Fireman's Fund has not pointed to any emails in which the threat of exposure was accompanied by an explicit demand for $215,000 in exchange for silence. Black periodically set deadlines for compliance with his demands, then evidently backed off without carrying out his threats.[13] And though Fireman's Fund argues that Black had no reason to wait for a final denial of his claim before conducting his Internet campaign unless he was trying to pressure Fireman's Fund into paying his claim, we quoted above an email exchange suggesting he did so at Lesser's request. Under these circumstances, the reasons for his waiting appear to be issues of fact.

In short, on the record before us, we cannot say Black's communications amounted to extortion as a matter of law.

D.    Fireman's Fund Established Under the Second Step of the Anti-SLAPP Analysis that its Causes Have Minimal Legal Merit Under the Facts Established Thus Far in the Proceedings.

Having concluded that Black satisfied his burden of showing that some of his communications constituted protected speech, and having not found uncontroverted or uncontested evidence that Black's communications amounted to extortion as a matter of

---

[13] In an email dated April 4, 2011, Black demanded that his claim be settled that week, warning that "after Friday, *the cost of my claim will increase substantially*, as will the legal and personal liability risks to" Fireman's Fund employees. (Italics added.) He ended the note, "My demand remains the same, $215,344.85 for my property loss, plus accrued claims processing costs and interest." This email may tend to show that Black was unwilling to negotiate and planned to "go public" unless his claim was paid in full, but again the language used is subject to varying interpretation, and he did not, in fact, go public after the week's end.

22

law, we turn to the second step of the anti-SLAPP analysis.[14]  As we have discussed, under the second step a plaintiff must show that " ' "defenses are not applicable . . . as a matter of law *or* [must demonstrate] a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." '  [Citations.]" (*Birkner v. Lam*, *supra*, 156 Cal.App.4th at pp. 285-286, italics in original.)  Depending on the case, the issue under the second step may be factual, legal, or mixed.  If, for example, a plaintiff alleged that a defendant had made defamatory statements, and the defendant denied having made those statements, the plaintiff's burden under the second step would require a showing of some factual basis for its contention that the statements were made.  Here, however, the parties do not dispute many of the essential facts, but instead simply dispute how they should be characterized and whether Fireman's Fund's claims are barred as a matter of law.[15]  In such a case, for a plaintiff to satisfy its burden under the second step it must show that the claim has a "minimal level of legal sufficiency." (*Grewal v. Jammu, supra,* 191 Cal.App.4th at p. 989; *Navellier, supra*, 29 Cal.4th at p. 89.)

We conclude Fireman's Fund has established that its claims against Black have at least a minimal level of legal sufficiency because Black's defenses are either inapplicable as a matter of law or it has made a prima facie showing of facts negating the defense.[16]

---

[14] We can either remand the second-step analysis to the trial court (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 286-287; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 392) or decide it ourselves since it is subject to independent review.  (*Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.* (2014) 225 Cal.App.4th 1345, 1355; *Malin v. Singer*, *supra*, 217 Cal.App.4th at p. 1300.)  We elect to decide it ourselves for the sake of expediency.

[15] Even if the parties had not forfeited their evidentiary objections below and on appeal (see ante, fn. 10), we would still conclude that Fireman's Fund met its burden of establishing a prima facie showing of facts under the second step based on the parties' agreed-upon facts.  Although the parties generally ask us to disregard their opponent's facts, the parties rely on many of the same facts.

[16] In doing so, we make no determination whether Fireman's Fund can prove its allegations or whether there may be other legal impediments to the claims not raised by the parties in the context of the anti-SLAPP motion.  We also make no determination whether these issues can be resolved on dispositive motions without the need for a trial.

Two of the defenses—res judicata and the litigation privilege—would bar all of Fireman's Fund's causes while the other defenses at issue would bar specific causes of action. We now turn to discuss each of these defenses.

*1.     Fireman's Fund's Claims Are Not Barred by Principles of Res Judicata.*

Black argues that Fireman's Fund's causes of action are barred by res judicata because the workplace-violence petition under section 527.8 was resolved against Fireman's Fund. We disagree and conclude Fireman's Fund has satisfied its burden of demonstrating that res judicata does not bar its causes of action.

Res judicata precludes "relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) When applicable, res judicata is conclusive on all issues that were raised or that could have been raised in the earlier proceeding. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1205.) A prior judgment is only a bar, however, if the cause of action in the second proceeding is the same as that asserted in the first. (*Branson v. Sun-Diamond Growers of California* (1994) 24 Cal.App.4th 327, 340.) Two causes of action are the same if they are based on the same " 'primary right.' " (*Federation,* at p. 1202, citing *Mycogen Corp., supra*, at p. 904.) "[D]ifferent primary rights may be violated by the same wrongful conduct"; *Branson*, at p. 342 [" 'The significant factor is the harm suffered; that the same facts are involved in both suits is not conclusive' "]; *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798 ["[U]nder the primary rights theory, the determinative factor is the harm suffered. . . ."])

Here, Fireman's Fund was the petitioner in the section 527.8 action and is the plaintiff in this civil action. But the causes of action do not involve the same harm. In the section 527.8 action, the primary right was not Fireman's Fund's own injury, but was instead a prospective right of the company's employees to be free from workplace violence. In the instant suit, the primary right is Fireman's Fund's right to be free from communications it alleges amount to civil extortion and interfere with its contracts and prospective economic advantage. Fireman's Fund is not precluded from proving that

24

Black is liable to it for civil injuries caused by his communications just because it was denied an injunction in the section 527.8 proceeding. Accordingly, Fireman's Fund has satisfied its burden of demonstrating that res judicata does not bar its causes of action.

> ### 2. Black Forfeited His Argument that the Litigation Privilege Bars Fireman's Fund's Claims.

Black argues on appeal that Fireman's Fund cannot demonstrate that its claims have minimal legal merit because the claims are barred by Civil Code section 47 and the First Amendment since his communications were part of his "efforts to resolve his disputes with [Fireman's Fund] so that he did not have to initiate official proceedings." The litigation privilege " 'arises at the point in time when litigation is no longer a mere possibility, but has instead ripened into a proposed proceeding that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute.' [Citation.]" (*Haneline Pacific Properties, LLC v. May* (2008) 167 Cal.App.4th 311, 319.)

We decline to resolve this issue at this stage of the proceedings, however, because Black forfeited the argument for purposes of this appeal by not raising it below in connection with the anti-SLAPP motion. In the trial court, Black made a vague reference to a "litigation privilege" in his notice of motion, but he provided no substantive argument in the moving or reply papers. He is thus foreclosed from relying on the argument on this appeal. (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [appellate court " 'ignores arguments, authority, and facts not presented and litigated in the trial court' "].)

> ### 3. Fireman's Fund Has Established that its Claim for Civil Extortion Has Minimal Legal Merit.

As we discussed above, we cannot conclude that Black's communications amounted to extortion as a matter of law. But we can conclude that Fireman's Fund has established that its claim for extortion has at least minimal legal merit.

Black argues that Fireman's Fund cannot state a claim for extortion because extortion requires the payment of money and because a corporation cannot be subject to

extortion. We disagree with both arguments. We recognize there is older authority suggesting that civil extortion should be analyzed as a claim for menace or duress and should therefore require money to have been paid in response to the threat. (*Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 426; see also *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1172.) But this view has been rejected by more recent authority, and we reject it here. (See *Monex Deposit Company v. Gilliam* (C.D. Cal. June 1, 2010, No. SACV 09-287 JVS) 2010 WL 2349095, *7; *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian, supra,* 218 Cal.App.3d 1058, 1079.) As our state Supreme Court recognized in *Flatley, supra*, 39 Cal.4th at pages 326-327, a cause of action for civil extortion exists and can be brought even if the money demanded was not actually paid.

We further conclude a person can be liable for civil extortion even if the entity from which he or she seeks payment is a corporation rather than an individual. This notion is not new. *Barton v. State Bar* (1935) 2 Cal.2d 294 was an extortion case involving a lawyer's threats to report an oil company to the prosecutor for dumping gasoline (with threatened resultant publicity) unless the corporation paid his clients. In *People v. Bolanos* (1942) 49 Cal.App.2d 308, the defendant was subject to prosecution for extortion for threatening to damage the business of a table-linen supply company, a corporation. And in *People v. Peppercorn* (1939) 34 Cal.App.2d 603, the defendants were indicted on charges of conspiracy to commit extortion and extortion of, among others, three corporations. Although these cases did not specifically address whether corporations can be victims of extortion, their holdings strongly suggest they can be. We discern no compelling policy reasons why one who has engaged in extortionist behavior should be excused from accountability simply because the money sought was to be paid by an entity with a corporate form.

We conclude that Fireman's Fund has established that its claim for civil extortion has at least minimal legal merit.

### 4. Fireman's Fund Has Established that its Claim for Interference with Contractual Relations Has Minimal Legal Merit.

A claim for interference with contractual relations requires: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts to induce a breach or disruption of the contractual relationship; and (4) actual breach or disruption of the contractual relationship [resulting in damage]." (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.) A third party unlawfully interferes with an employer's contractual relationship with its employees if that third party intentionally sets out to disrupt the employer-employee relationship. (*I. J. Weinrot & Son, Inc. v. Jackson* (1985) 40 Cal.3d 327, 341.)

Black's communications arguably support a claim for interference with Fireman's Fund's contractual relations with its employees and parent company. Black was clearly aware of those relationships through his constant threats to "escalate" his grievances up the Fireman's Fund corporate ladder, and then to Allianz. Black's accusations of wrongdoing and his demands that Fireman's Fund fire or discipline certain employees could be interpreted to have been intended to wrongfully interfere with those contractual relationships. And Black's insistence on including senior executives of Allianz in his emails could be interpreted to have been intended to wrongfully disrupt Fireman's Fund's contractual relationship with Allianz. We conclude that Fireman's Fund has demonstrated that its claim for interference with contractual relations has at least minimal legal merit.

### 5. Fireman's Fund Has Established that its Claim for Interference with Prospective Economic Advantage Has Minimal Legal Merit.

The elements of intentional interference with prospective economic advantage are: " ' "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." ' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.)

27

Fireman's Fund alleged that Black's accusations of its unlawful misconduct were untrue, and it further alleged that Black's threats to publish false and disparaging information were done with the intent to disrupt Fireman's Fund's business. We are aware of at least one email in which Black suggested he intended to cause Fireman's Fund "serious market consequences."

On appeal, Black argues that Fireman's Fund must "plead and prove" his conduct was wrongful under some other independent legal theory. But, as we have discussed, this is incorrect. All Fireman's Fund must show under the second step is that its claim has at least minimal legal merit. (*Grewal v. Jammu, supra,* 191 Cal.App.4th at p. 989; *Navellier, supra*, 29 Cal.4th at p. 89.) It has done so. Fireman's Fund explained that it is seeking injunctive relief to avoid business harm and the loss of goodwill and customers. Crediting the evidence in its favor, it has demonstrated that its claim for interference with prospective economic advantage has at least minimal legal merit.

> 6. *Fireman's Fund Has Established that its Claim for Unfair Competition Has Minimal Legal Merit.*

The fourth cause of action asserted by Fireman's Fund is violation of the unfair competition act (the UCL), which makes illegal " 'any unlawful, unfair, or fraudulent business act or practice." (Bus. & Prof. Code, § 17200 et seq.) The language of the UCL is extraordinarily broad, and its coverage " 'is sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) Indeed, the UCL's inclusion of unfair or fraudulent business practices permits a UCL claim to be premised on acts and practices not specifically proscribed by any other law. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.)

Whether Fireman's Fund's claim has minimal legal merit is close because it is far from apparent that Black's communications were part of a business activity, even under the UCL's broad reach. Black was sued in his individual capacity, and the complaint against him does not allege he was acting in a business capacity. But whether an act is business related " 'is a question of fact dependent on the circumstances of each case.' "

(*People v. E.W.A.P., Inc*. (1980) 106 Cal.App.3d 315, 320-321.)  The resolution of the claim here will depend on a determination of factual issues, such as whether Black was engaged in business-related activity, that cannot be resolved at this stage of the proceedings.  Suffice it to say for purposes of this appeal, Fireman's Fund has established that its UCL claim has at least minimal legal merit.

E.      Fireman's Fund Can Be Awarded Injunctive Relief Consistent with Constitutional Limits if it Prevails on Any of its Claims.

Black argues that Fireman's Fund seeks an unconstitutional prior restraint based on the language of the prayer for relief.  We disagree.  Injunctive relief, if any, will only be awarded on remand after a trial in which the legality of Black's communications will have been adjudicated.  If any communications are determined to be illegal, they can be enjoined from being repeated.  "[F]ollowing a trial at which it is determined that the defendant defamed the plaintiff, the court may issue an injunction prohibiting the defendant from repeating the statements determined to be [illegal]." (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1155-1156.)  Any injunction, of course, will need to be " 'tailored as precisely as possible to the exact needs of the case' " and should sweep " 'no more broadly than necessary.' " (*Id.* at p. 1159.)  But we are confident that if Fireman's Fund prevails on any of its claims, the trial court will be attentive to applicable constitutional constraints in fashioning appropriately narrow relief.

DISPOSITION

For the reasons stated, the order denying the special motion to strike under section 425.16 is affirmed.

_____

Humes, P.J.

We concur:


_____

Margulies, J.


_____

Banke, J.